# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs July 12, 2016

## STATE OF TENNESSEE v. JEREMY JONES

**Appeal from the Criminal Court for Shelby County**
**No. 13-02332     Glenn Wright, Judge**

---

**No. W2015-01528-CCA-R3-CD  -  Filed September 26, 2016**

---

The defendant, Jeremy Jones, was convicted by a Shelby County Criminal Court jury of attempted first degree murder, a Class A felony; aggravated assault, a Class C felony; employment of a firearm during the commission of a dangerous felony, a Class C felony; and convicted felon in possession of a firearm, a Class C felony.  The trial court imposed an effective term of twenty-five years in the Department of Correction.  On appeal, he argues:  (1) the evidence is insufficient to sustain his convictions; (2) the trial court failed to ensure an impartial jury venire; and (3) he is entitled to relief due to cumulative error at trial.  After review, we affirm the judgments of the trial court.  However, we remand for entry of a corrected judgment in Count 3 to check the box indicating that the defendant was found guilty in that count.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded for Entry of Corrected Judgment

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Gregory D. Allen (on appeal); Arthur E. Horne and Carlissa Shaw (at trial), Memphis, Tennessee, for the appellant, Jeremy Jones.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carla Taylor, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant was indicted for attempted first degree murder, aggravated assault, employment of a firearm during the commission of a dangerous felony, and convicted felon in possession of a firearm as a result of his shooting Marques Black, the victim, on July 31, 2012, in an alley behind a neighborhood corner store.

At trial, Yolanda Barbee testified that on July 31, 2012, she was visiting a friend, Tracy Johnson, at an apartment complex in the Frayser area of Memphis. She was walking to a nearby store with Ms. Johnson and another friend when they encountered the defendant in a "cut" between the apartment complex and store. The defendant was making comments and threats about no one else being allowed to sell drugs on the path between the apartments and the store. Ms. Johnson asked the defendant specifically about her cousin, the victim, and the defendant said he was not going to do anything to the victim. Ms. Barbee and her friends continued on to the store and then returned to the apartment complex. After returning from the store, they encountered the victim, who was heading to the store. Ms. Barbee went into the apartment and had brought chairs out onto the porch when she heard two gunshots and the victim calling out Ms. Johnson's name. Ms. Barbee and Ms. Johnson ran through the "cut" to the victim and, while doing so, saw the defendant walking to his truck with a gun in his hand.

On cross-examination, Ms. Barbee admitted that she did not mention Ms. Johnson in her statement to police after the shooting because Ms. Johnson "had two warrants for her" and Ms. Barbee did not want to involve her. Ms. Barbee elaborated that Ms. Johnson left her with the victim at the scene before the police arrived because of the outstanding warrants.

Marques Black, the victim, testified that in July 2012, he was living in an apartment with his cousin, Tracy Johnson. On July 31, he was walking to a store adjacent to the apartment complex when he encountered the defendant. The victim said that the defendant told him that he could not enter the store unless he belonged to a particular gang. The defendant also said to him that he "can't be over here selling weed in my neighborhood." The victim disregarded the statements and entered the store but, upon exiting, was shot in the arm from behind by the defendant. The bullet entered his left arm near the elbow and exited out the front of his arm. The victim turned around and saw the defendant fire another shot, which struck him in the stomach and exited through his back. The defendant then approached him, saying, "I'm fixing to kill this nigger," and tried to shoot him again, this time in the head. However, the defendant's gun jammed and he walked away "very slow, nonchalant, like he didn't even care." The victim called out for help after the defendant left.

The victim testified that drugs were not mentioned during his interaction with the defendant. He also said that, although he used marijuana, he did not sell drugs. He

admitted that he was walking to the store that day to buy a cigar, which he intended to use to smoke marijuana. The victim said that he was hospitalized for three weeks after the shooting. He had three feet of intestines, his gallbladder, and half of his liver removed. The left side of his body was paralyzed for a month and a half after the shooting, and he still cannot run or ride a bicycle.

Elmer Macklin, the maintenance supervisor for the apartment complex near where the shooting occurred, testified that on July 31, 2012, he was working in an apartment next to the store when he heard gunshots. He went outside and saw a young man walk by him, place a gun in his belt in a "nonchalant" fashion, and get into a truck and leave. He initially could not identify that person in the courtroom but was later able to with the aid of his eyeglasses.

On cross-examination, Mr. Macklin acknowledged that he gave the police a statement after the incident in which he may have said that he saw the gunman and the victim "hanging out" the day of the incident.

Carrie Malone, a resident of the apartment complex near where the shooting occurred, testified that on July 31, she was locking her door to leave when she saw the victim and spoke to him. She then saw the defendant come up from behind the victim, pull out a gun, and shoot the victim twice. She did not hear any words exchanged between the two men. Ms. Malone recalled that a few minutes before the shooting, she had stepped outside to check her mailbox and had seen the victim, the defendant, and another individual standing together at the corner store. She could not hear their conversation, but "[i]t didn't look like they was having any misunderstandings or anything." Ms. Malone recalled that, after the shooting, the defendant "walked to his truck like he never did anything. Got in and pulled off, not fast or anything, took his time."

Officer Sean Bolton of the Memphis Police Department responded to the scene, where he found the victim lying on the ground in a "cut" between the store and apartment complex. He waited for the paramedics to arrive and then conducted a preliminary investigation to determine what had happened. He did not believe any of the witnesses saw the actual shooting, but one witness saw the suspect walking away holding a pistol. Another witness told him that the victim had been in an altercation with the suspect at the corner store earlier in the day. Randy Reed, a paramedic with the Memphis Fire Department, administered aid to the victim and transported him to the hospital.

The defendant stipulated that he previously had been convicted of aggravated assault.

3

The defendant also offered proof in the form of the testimony of Rachael Geiser, a private investigator. Ms. Geiser stated that she interviewed Ms. Malone on December 17, 2013, and Ms. Malone told her that she was inside her apartment when she heard a gunshot. Ms. Malone said that she then went outside at which point she saw the defendant "follow behind the victim . . . and shoot him in the back. And then she said that [the defendant] walked off and got into a truck and left the scene." Ms. Geiser stated that she also asked Ms. Malone about why she thought the shooting occurred, and Ms. Malone responded that the victim "sold drugs at the store next door."

Following the conclusion of the proof, the jury convicted the defendant, as charged, of attempted first degree murder, aggravated assault, employment of a firearm during the commission of a dangerous felony, and convicted felon in possession of a firearm. The trial court conducted a sentencing hearing, after which the court imposed a sentence of fifteen years for the attempted first degree murder conviction, six years for the aggravated assault conviction, ten years for the employment of a firearm conviction, and three years for the felon in possession of a firearm conviction. The court aligned all of the sentences concurrently except for the conviction for employment of a firearm, which was aligned consecutively to the other sentences as required by statute, for a total effective term of twenty-five years.

## ANALYSIS

### I. Sufficiency

The defendant challenges the trial court's denial of his motion for judgment of acquittal and the sufficiency of the evidence at trial. Although worded differently, each of these issues is essentially a challenge to the sufficiency of the convicting evidence, and we thus combine the issues.

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In cases where the defendant has been charged with the attempted commission of a crime, there must be evidence that the defendant acted "with the kind of culpability otherwise required for the offense" and acted "with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a), (a)(2). First degree murder is defined as "[a] premeditated and intentional killing of another." Id. § 39-13-202(a)(1). "Premeditation" is

an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

The "element of premeditation is a question of fact" for the jury to determine based upon a consideration of all the evidence. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)). "[P]remeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment' as required by Tennessee Code Annotated section 39-13-202(d)." State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003). A jury may infer premeditation from circumstantial evidence surrounding the crime. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). There are several factors which our courts have concluded may be evidence of premeditation: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing." Bland, 958 S.W.2d at 660. An additional factor from which a jury may infer premeditation is evidence establishing a motive for the killing. See State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998).

Viewing the evidence in the light most favorable to the State, the defendant shot the unarmed victim from behind and, when the victim turned around, shot him again. The defendant walked up to the victim and attempted to shoot him a third time, but his gun jammed and he was unsuccessful. In a nonchalant fashion, the defendant then tucked away his gun, walked to his truck, and drove away. There was also evidence that the defendant previously expressed threats toward anyone who stepped on his turf. This evidence is sufficient for the jury to find that the defendant intentionally and with premeditation attempted to kill the victim.

The defendant's assertion that "premeditation was nonexistent in this case" relies on discounting the testimony from various State witnesses as not credible. However, the weight and credibility of each witness's testimony is solely a question for the jury. Defense counsel attempted to impeach the witnesses' credibility through vigorous cross-

examination and in closing argument and, by its verdict and in its province, the jury found at least the essential elements of those witnesses' testimonies to be credible.

In order to convict the defendant of aggravated assault, the jury had to find that the defendant intentionally or knowingly, by using or displaying a deadly weapon, caused bodily injury to the victim. Tenn. Code Ann. §§ 39-13-101(a)(1), -102(a)(1)(A)(iii). We initially note that, at times, the defendant appears to concede that he is guilty of aggravated assault. To the extent he challenges this conviction, the evidence shows that the victim had three feet of intestines, his gallbladder, and half of his liver removed. He is still unable to run or ride a bicycle as a result of his injuries. It was undisputed that the defendant was armed with a gun. Thus, the evidence is sufficient to sustain the defendant's conviction for aggravated assault. Any assertion by the defendant that there was no testimony concerning the victim's being placed in fear is irrelevant as the defendant was charged with aggravated assault by causing bodily injury, not placing in fear.

It is a crime to employ a firearm during the commission of or attempt to commit a dangerous felony. Id. § 39-17-1324(b)(1), (2). Attempted first degree murder is defined as a dangerous felony. Id. § 39-17-1324(i)(1)(A). The defendant challenges this conviction solely by virtue of his challenge to the sufficiency of the evidence of attempted first degree murder, arguing that his conviction for employment of a firearm can only stand if he also committed or attempted to commit the underlying dangerous felony. Having determined that the proof is sufficient to support the defendant's conviction for attempted first degree murder, the evidence is sufficient to support the defendant's conviction for employment of a firearm during the commission of or attempted commission of attempted first degree murder.

The defendant concedes that his conviction for being a convicted felon in possession of a firearm, id. § 39-17-1307(b)(1)(A), stands in light of the jury's finding of guilt in this case as affirmed by this court.

## II. Jury Venire

The defendant argues the trial court failed to ensure an impartial jury venire in that the court did not "shuffle the names of the jury venire before calling potential jurors to the jury pool" and thereby did not "remove all . . . potential for a tainted jury."

At the hearing on the motion for new trial, defense counsel explained this argument by stating:

He's entitled to an impartial jury of his peers. In that, the defendant's absen[ce] from the place where these names were compiled and selected made it incumbent upon the [c]ourt to randomly shuffle these names and to remove all inferences of – or potential for a tainted jury – for tainted jury selection process.

The defendant, however, has not provided any record of how the jury pool was selected. All the record shows is that, at the beginning of voir dire, the trial court instructed the court officer to "call twenty names." No one objected to this process or expressed any concern throughout the entire voir dire. The defendant did not object to the jury venire at any point during trial. The defendant never challenged the State's assertions at the motion for new trial hearing that the names "already come in a random order" and that the defendant had the opportunity to voir dire the jurors.

We conclude that the defendant is not entitled to relief on this issue due to both waiver and on the merits. First, the defendant failed to provide any record or evidence that the trial court selected the names in an improper manner, or even how the names were selected at all. The defendant has "a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993) (citing State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983)). "Absent the necessary relevant material in the record an appellate court cannot consider the merits of an issue." Id. at 561.

The defendant also failed to object to the process during jury selection. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

Further, the defendant has not referred to a single case suggesting that the trial court's failure to shuffle the names of the jurors somehow disqualified the entire panel. The defendant does cite to case law for general principles about impartial juries and the role of voir dire, which establish that "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." State v. Hester, 324 S.W.3d 1, 39 (Tenn. 2010) (quoting Taylor v. Louisiana, 419 U.S. 522, 538 (1975)). However, the defendant has not challenged the actual composition of the jury pool and does not allege that the jury selection process "systematically exclude[d] distinctive groups in the community." Id. The defendant seemingly claims, without any evidence in the record to support it, that there were insufficient guarantees of trustworthiness in the jury selection process that the trial court should have cured by *sua sponte* deciding to shuffle the names in the jury pool. We are not aware of, nor has the defendant brought to

our attention, any Tennessee case requiring the trial court to shuffle the names in the jury pool for any reason, let alone because of an undisclosed concern that the process for selecting the entire venire is inadequate.

### III.  Cumulative Error

The defendant lastly argues that the cumulative effect of the errors at trial warrants reversal, even if none of the errors do so individually.  However, having found no errors, we respectfully disagree and conclude that the defendant is not entitled to relief on the basis of cumulative error.

### CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.  However, we remand for entry of a corrected judgment in Count 3 to check the box indicating that the defendant was found guilty in that count.

_____

ALAN E. GLENN, JUDGE